UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
: 
PAUL CHAU,                                           :     ___ Civ. ___
                                                     :     ECF Case
                       Plaintiff,                    :
                                                     :     COMPLAINT
          -against-                                  :     AND JURY DEMAND
                                                     :
ISRAEL DISCOUNT BANK OF NEW                          :
YORK,                                                :
                                                     :
                                                     :
                       Defendant.                    :
                                                     :
------------------------------------------------------x

      Plaintiff Paul Chau, by his attorneys, Bantle & Levy LLP, as and for his complaint against Israel Discount Bank of New York alleges as follows:

### NATURE OF THE ACTION

      1.     This is an action for employment discrimination based on race and religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), New York State Human Rights Law, N.Y. Exec. L. § 290 et seq. ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").

      2.     Plaintiff Paul Chau ("Chau") is a Chinese American, non-Jewish man, who was employed in the Commercial Banking Group at Israel Discount Bank of New York ("IDB" or the "Bank") for nine years, where he served as a Senior Vice President and Group Head of Middle Market Banking.

      3.     During his employment, Chau was the only Asian Group Head in the Commercial Banking Unit, the Unit's most senior Asian employee, and one of only two Asian members in the seventeen (17) member Middle Market Group.

4. Throughout his tenure at IDB, Chau was denied resources regularly provided to other Group Heads, was subjected to higher budgets than other Group Heads and was denied opportunities for advancement within the Bank.

5. In or about September 2023, Chau raised concerns about differential treatment and lack of advancement at IDB with Lissa Baum, IDB's then-Chief Lending Officer ("CLO").

6. In response to Chau's expressed concerns, Baum advised Chau that he was one of two candidates she was considering as her potential successor in the CLO role.

7. Based on his strong performance at the Bank, including his consistent out-performance of other Group Heads in the Commercial Banking Unit, Chau was an outstanding candidate for the CLO position.

8. Chau also received a highly favorable leadership assessment profile from a vendor designated by the Bank to evaluate his leadership abilities.

9. Before any action was taken on the CLO position, Chau was abruptly terminated on November 28, 2023.

10. The termination of Chau's employment was based on discriminatory animus against him as one of only a small number of non-Caucasian and non-Jewish managers at the Bank, and the only Asian, non-Jewish Group Head in the Commercial Banking Unit.

11. As a result of the Bank's discriminatory decision to pass over Chau for the CLO position and its discriminatory decision to terminate his employment without legitimate justification, Chau has suffered significant financial, emotional, and reputational harm, and his career and professional trajectory have been unduly undermined and disrupted.

**JURISDICTION AND VENUE**

12. This Court has jurisdiction over this action under 28 U.S.C. § 1331.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to U.S.C. 1367(a) as all claims share a common nucleus of operative fact as to form part of the same case or controversy.

14. A substantial part of the acts giving rise to this action were committed within the State of New York, City of New York, and venue is properly lodged in this Court pursuant to 42 U.S.C. 2000e-5(f)(3).

15. All conditions precedent to jurisdiction under 29 U.S.C. § 626(d) and § 706 of Title VII, 42 U.S.C. § 2000e-5(f)(3) have occurred or been complied with:

   a. On or about April 26, 2024, Chau filed a written Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

   b. In his Charge of Discrimination, which was filed within 300 days after the adverse actions of which he complains in this action, Chau alleged that IDB discriminated against him on the basis of his race and religion.

   c. A notification of Right to Sue was issued by the EEOC and received by Chau on or about October 1, 2024.

   d. This complaint has been filed within 90 days of Chau's receipt of the EEOC's notification of Right to Sue.

16. Chau is a citizen of the State of New Jersey and currently resides in Midland Park, New Jersey.

17. Upon information and belief, Defendant IDB is an Israeli Banking Institution that provides commercial banking, private banking, and wealth management services with its New York branch at 1114 6th Avenue, New York, New York.

18. At all times relevant herein, the Bank is an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), and the NYSHRL, N.Y. Exec. L. § 292(5).

19. IDB is a person within the meaning of Title VII, 42 U.S.C. § 2000e(a), the NYSHRL § 292(1) and the NYCHRL §§ 8-102(5), 8-107.

## STATEMENT OF FACTS

<u>Chau's Background and Professional Experience</u>

20. Plaintiff Paul Chau is a Chinese American, non-Jewish man.

21. Commencing in September 2014, Chau was employed by IDB for approximately nine years.

22. Prior to his employment at IDB, Chau had twenty-eight years of overall experience, and thirteen years of management experience, in banking, including employment at Fleet Bank, Marine Midland Bank, NatWest, and First Chicago.

23. For the entire duration of Chau's employment at IDB, Chau served as a Senior Vice President and Group Head of Middle Market Banking, which was a Group within IDB's Commercial Banking Unit.

24. Throughout his employment at the Bank, Chau was open about the fact that he was not Jewish, including, inter alia, offering to work and working on Jewish holidays when his Jewish colleagues were off.

25. Chau's colleagues often have remarked on his willingness to work on Jewish holidays and were cognizant that he was willing to do so because he did not observe the Jewish religion.

**Chau's Employment History at Israel Discount Bank**

26. In his capacity as Group Head of Middle Market Banking, Chau was tasked with

managing the Middle Market team in the New York Metropolitan area, with a concentration in the Textile, Apparel and Consumer Goods industries.

27. Throughout his employment at IDB, Chau was highly successful at leading the Middle Market Group, including, inter alia, (i) growing loans outstanding from $714 million as of December 31, 2017 to $1.2 billion as of December 31, 2022; (ii) elevating the Middle Market Group to first among IDB's Commercial Banking Unit groups in cash management income; (iii) consistently elevating the Middle Market Group to among the top groups in the Commercial Banking Unit in generating Non-Interest Revenue; (iv) elevating the Middle Market Group to first among the Commercial Banking Unit groups in number of marketing calls made; and (v) consistently elevating the Middle Market Group to first among the Commercial Banking Unit groups in cross-selling bank products and services.

28. Chau succeeded as a Group Head at IDB despite being routinely denied resources provided to other Group Heads. For example, from 2016 through 2019, Chau's Group was denied team leaders despite the fact that the Middle Market Group was one of the largest Groups within the Commercial Banking Unit and he managed one of the biggest portfolios.

29. Despite the challenges he faced at IDB, due to the strong performance of the Middle Market Group under his leadership, Chau routinely received positive feedback on his job performance at IDB.

30. However, the positive feedback Chau received did not translate into significant bonuses and raises, as it did for certain Caucasian and Jewish Group Heads.

31. Unlike his Caucasian and Jewish counterparts, Chau also was subjected to employee discipline for conduct of junior members of his Group that he was not aware of and did not approve.

32. In or about September 2023, Chau expressed concerns to CLO Baum that he was being subjected to differential treatment at the Bank, including being unfairly subjected to employee discipline, and raised the question of whether he would need to leave IDB to obtain professional advancement.

33. Baum was dismissive of Chau's concerns that he had been subjected to differential treatment but sought to reassure Chau of his value to IDB by advising Chau that he had been selected by her as one of two candidates to be her potential successor as CLO when she decided to leave the Bank.

34. Baum directed Chau to meet with IDB's Chief Executive Officer & President, Ziv Biron ("Biron"), to discuss his future at IDB, including the potential for future promotion in the CLO role.

35. Thereafter, Chau met with Biron, who advised Chau that he was committed to Chau's short and long-term professional development at the Bank and that he was among a short list of potential candidates to succeed Baum as CLO.

36. During this meeting with Biron, Chau expressly questioned Baum's commitment to Chau having a long-term career at IDB based on the lack of professional support he had received from Baum over the years.

37. In response, Biron raised the possibility of IDB placing Chau in a leadership position in the Bank's Florida office as one way to keep Chau at IDB and advance his career.

38. As part of charting Chau's future with IDB, including further assessing appropriate growth opportunities, Biron directed Chau to complete a management profile assessment with Korn Ferry, a vendor used by IDB to assess and support the professional development of certain executives.

39. As summarized by Anne Tessien, a Principal at Korn Ferry, Chau's management profile assessment was extremely positive and concluded that Chau showed "[g]reat and strong alignment to the success profile and the strengths of leadership which we know serve organizations successfully."

**IDB Abruptly Terminates Chau Shortly After the Positive Korn Ferry Assessment**

40. On or about November 28, 2023, just two months after Baum and Biron informed Chau that he was being considered for the CLO position at the Bank, Chau was abruptly terminated by IDB without prior notice or warning.

41. Upon information and belief, Baum played a significant role in the decision to terminate Chau's employment.

42. Chau was informed by Baum and Vered Oron, IDB's Head of Human Resources, that his employment was being terminated as part of a purported reduction in force and restructuring of the Commercial Banking Unit.

43. As part of the alleged reduction in force in the Commercial Banking Unit, Chau was the only Group Head in the Commercial Banking Unit terminated.

44. As part of the alleged reduction in force in the Commercial Banking Unit, the Middle Market Group was effectively merged into the Mid-Corporate Lending Group. This was the only structural change made in the Commercial Banking Unit as part of the alleged reduction in force, and, on information and belief, Chau was the only management level employee in the Group to be terminated.

**IDB's Decision to Terminate Chau Acerbated Substantial Under-Representation Of Asians Within the Bank's Management**
.

45. As of the date of IDB's termination of Chau's employment, ten of the eleven members of the Bank's leadership team were Caucasian, and the majority were Israeli Jews.

46. As of the date of IDB's termination of Chau's employment, the vast majority of the employees in the Commercial Banking Unit were Caucasian and Jewish.

47. As of the date of IDB's termination of Chau's employment, Asian employees were significantly under-represented in management throughout the Bank.

48. As of the date of IDB's termination of Chau's employment, Chau was the only Asian Group Head among the six Group Heads who oversaw the ten distinct banking groups within the Commercial Banking Unit.

**IDB's Decision to Terminate Chau Perpetuated a Pattern and Practice of Differential Treatment Based on Race and Religion at IDB**

49. IDB's decision to terminate Chau's employment follows a pattern of differential treatment of non-white and non-Jewish employees, including Asian employees, at IDB as compared to their Caucasian and Jewish counterparts, including differential treatment in hiring, employee discipline and termination.

50. On information and belief, throughout his employment, Chau was subject to higher employment standards than his Caucasian and Jewish colleagues.

51. Among other things, the budgets and goals assigned to Chau were consistently among the highest of the Group Heads in the Commercial Banking Group.

52. IDB consistently imposed inflated performance goals on Chau as compared to his Caucasian and Jewish colleagues.

53. For instance, in 2023, the Bank imposed a seventeen percent target loan budget increase on Chau and the Middle Market Group; in comparison, the other Commercial Banking Unit groups, all managed by Caucasian and Jewish managers, with one exception, each had a ten percent or less target loan budget increase.

54. IDB also more harshly imposed employee discipline on Chau than on his Jewish and Caucasian peers at the Bank.

55. For example, Chau was subjected to employee discipline for the actions of junior members of his Group for which he was responsible and had no reason to be aware, whereas Mark Weiss, a Caucasian and Jewish employee who directly supervised the junior employees and was aware of the misconduct, was not disciplined.

56. IDB also repeatedly favored Caucasian and Jewish people in making hiring and firing decisions for management level employees.

57. During Chau's employment at IDB, several non-Caucasian and non-Jewish employees – including the former Chief Financial Officer, Head of Human Resources, and Chief of Staff for the Commercial Banking Unit – were terminated by IDB and promptly replaced by Caucasian and Jewish employees.

58. Throughout Chau's employment, the Bank's Charter dictated that IDB's Chief Executive Officer be Israeli.

59. IDB's preferential treatment of Caucasian and Jewish employees over and above Asian and non-Jewish employees also permeated the Bank's day-to day business operations.

60. For example, during Chau's tenure at IDB, certain members of the Commercial Banking Unit refused to lend to Korean owned companies for some time, with Howard Weinberg, the progenitor of that policy and practice, purporting to justify that behavior based on his stated belief that "you cannot trust Korean people because they have no honor."

61. Chau brought this discriminatory practice to the attention of IDB leadership and demanded that the Bank take corrective action.

62. While the Bank took steps to end its discriminatory lending practices, Weinberg, who is Caucasian and Jewish, was not subjected to employee discipline by IDB based on his implementation of the discriminatory ban on lending to Korean owned companies.

**Chau's Strong Performance Record as a Group Head Evidences
<u>IDB's Discriminatory Motive in Singling Out Chau for Termination</u>**

63. As of the date IDB decided to terminate Chau's employment, under Chau's leadership the Middle Market Group was consistently among the highest grossing groups within the Commercial Banking Unit, and consistently among the most successful groups across numerous business metrics.

64. At the time of his termination, Chau's Middle Market Group was at the top of all Commercial Banking Units in several key business metrics.

65. Throughout 2023, the Middle Market Group led all Commercial Banking Unit Groups in deposits outstanding and was running forty-six percent (46%) above budget in that category, well above its peer Groups.

66. Most of the other Commercial Banking Unit groups lagged the Middle Market Group by thirty percent (30%) to sixty percent (60%) in this category.

67. Throughout 2023, the Middle Market Group ranked second in loans outstanding among the ten distinct groups within the Commercial Banking Unit.

68. In 2022, the Middle Market Group lead all Commercial Banking Unit groups in cash management income, accounting for over thirty-six percent (36%) of the cash management income of the entire Commercial Banking Unit.

69. The performance data of the Groups within the Commercial Banking Unit evidences IDB's discriminatory motive in deciding to terminate Chau and eliminate the position of Group Head of the Middle Market Group.

70. As of the date IDB decided to terminate Chau's employment, the Middle Market Group also was among the one or two largest groups in the Commercial Banking Unit.

71. As of the date IDB decided to terminate Chau's employment, there were several far smaller and far less productive groups within the Commercial Banking Unit that could have been combined if, in fact, a reduction of Group Heads was necessary.

72. Other objective markers such as seniority further establish that IDB's decision to single out Chau for termination among the Commercial Banking Unit's Group Heads was discriminatory.

73. Chau had significantly more seniority at IDB than several of the other Group Heads, including two Caucasian Group Heads, Laura Greenfield and Neil Wolfe, who each had been with the Bank less than one year.

74. Both Greenfield and Wolfe oversaw Groups that were far smaller than the Middle market Group both in terms of number of employees and revenue generated.

75. Both Greenfield and Wolfe oversaw Groups that were less successful than the Middle Market Group across multiple business metrics.

**With Chau's Termination, Management of the Middle Market Group**
**Was Transferred to a Less Successful, Caucasian, Jewish, Group Head**

76. As part of IDB's decision to terminate Chau, the Middle Market Group was moved under the auspices of Michael Paul ("Paul"), a Caucasian and Jewish Group Head.

77. At the time he was assigned management of the Middle Market Group, Paul oversaw the Mid-Corporate Lending Group, a group consisting of three sub-groups – the Mid-Corporate group, the Healthcare group, and the Not For Profit group.

78. Under Paul's management, two of the three sub-groups within the Mid-Corporate Lending Group – Mid-Corporate and Not For Profit – consistently underperformed the Middle Market Group in head-to-head comparisons.

79. At the time he was assigned leadership of the Middle Market Group, Paul had little or no experience in the Textile, Apparel and Consumer Goods specialty businesses central to the Middle Market Group's operations.

80. By contrast, Chau had significant professional experience in the industries handled by Paul's three groups – Mid-Corporate, Not for Profit and Healthcare – including while employed at TD Bank, First Chicago, Fleet, NatWest and Marine Midland Bank.

81. At the time he was assigned leadership of the Middle Market Group, Paul had a problematic history as a manager at IDB, whereas Chau did not have similar managerial issues.

82. Whereas Chau was never the subject of a formal complaint at IDB, upon information and belief, Paul had been the subject of at least three employee complaints that called into question his fitness as a manager.

83. During discussion of a possible successor for the CLO position just months before Chau's termination, Baum had admitted to Chau that due to Paul's poor record as a manager, Paul would require significant coaching if he were to assume a greater role at IDB; whereas Chau could step into a higher role with no coaching or development plan.

84. As a result of the decisions and actions described above, IDB has discriminated against Chau based on his race and religion when abruptly terminating Chau's employment.

85. The discriminatory actions of Defendant described above were undertaken willfully, intentionally, maliciously, and with reckless indifference to Chau's protected rights.

86. As a result of Defendant's discriminatory actions, Chau has been denied income and benefits, as well as continuing opportunities for promotion, advancement, and recognition.

87. As a result of Defendant's discriminatory actions, Chau has sustained significant mental and emotional harm and distress.

### FIRST CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of Title VII*

88. Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

89. As a result of its aforesaid acts, in terminating Plaintiff's employment at IDB on account of his race, Defendant has discriminated against Plaintiff on account of his race in violation of Title VII.

90. As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

### SECOND CAUSE OF ACTION
*Discrimination on the Basis of Religion in Violation of Title VII*

91. Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

92. As a result of its aforesaid acts, in terminating Plaintiff's employment at IDB on account of his religion, Defendant has discriminated against Plaintiff on account of his religion in violation of Title VII.

93. As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of

employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## THIRD CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of the NYSHRL*

94. Plaintiff repeats and realleges the allegations made above as if fully set forth herein.

95. As a result of their aforesaid acts, in terminating Plaintiff's employment at IDB on account of his race, Defendant has discriminated against Plaintiff on account of his race in violation of the NYSHRL.

96. As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## FOURTH CAUSE OF ACTION
*Discrimination on the Basis of Religion in Violation of the NYSHRL*

97. Plaintiff repeats and realleges the allegations made in paragraphs above as if fully set forth herein.

98. As a result of their aforesaid acts, in terminating Plaintiff's employment at IDB on account of his religion, Defendant has discriminated against Plaintiff on account of his religion in violation of the NYSHRL.

99. As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of

employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## FIFTH CAUSE OF ACTION
*Discrimination on the Basis of Race in Violation of the NYCHRL*

100.  Plaintiff repeats and realleges the allegations made in paragraphs above as if fully set forth herein.

101.  As a result of their aforesaid acts, in terminating Plaintiff's employment at IDB on account of his race, Defendant has discriminated against Plaintiff on account of his race in violation of the NYCHRL.

83.  As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## SIXTH CAUSE OF ACTION
*Discrimination on the Basis of Religion in Violation of the NYCHRL*

102.  Plaintiff repeats and realleges the allegations made in paragraphs above as if fully set forth herein.

103.  As a result of their aforesaid acts, in terminating Plaintiff's employment at IDB on account of his religion, Defendant has discriminated against Plaintiff on account of his religion in violation of the NYCHRL.

104.  As a result of Defendant's discriminatory and adverse acts, Plaintiff suffered damage, including without limitation, termination, deprivation of income and benefits, loss of 401k benefits, access to retirement medical benefits, and other perquisites of employment, loss of

employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life and damage to reputation and career.

## JURY DEMAND

105.   Chau hereby demands trial by jury.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief against Defendant:

(1) A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Chau's rights as secured by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").

(2) Reinstatement to the highest position to which Chau was and would be entitled and/or front pay;

(3) Actual damages in the form of:

   a. Back-pay with interest based on Chau's lost compensation had he not been wrongfully terminated; and

   b. Reimbursement for health benefits, social security, experience, training opportunities, 401k contributions, and other benefits in an amount to be shown at trial.

(4) Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount not less than $250,000;

(5) Punitive damages in an amount not less than $500,000;

(6) Attorneys' fees;

(7)  Costs and disbursements;

(8)  Interest; and

(9)  Such other and further relief as this Court may deem just and proper.

Dated: November 11, 2024
       New York, New York

BANTLE & LEVY LLP

By: *Robert L. Levy*
    Robert L. Levy (RL-1633)
99 Park Avenue, Suite 1510
New York, NY 10016
(212) 228-9666
Attorneys for Plaintiff